[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13339

_____

D.C. Docket No. 6:19-cv-00137-WWB-DCI

CURTIS HAMRICK,
on behalf of himself and those similarly situated,

Plaintiff-Appellee,

versus

PARTSFLEET, LLC,
a Florida Limited Liability Company,
PARTSFLEET II, LLC,
a Florida Limited Liability Company,
FLEETGISTICS HOLDINGS, LLC,
a Foreign Limited Liability Company,
SCRIPTFLEET, LLC,
a Florida Limited Liability Company,
US PACK SERVICES, LLC,
a Foreign Limited Liability Company,
MEDIFLEET, LLC,
a Foreign Limited Liability Company,
US PACK HOLDINGS, LLC,
a Foreign Limited Liability Company,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 22, 2021)

Before BRANCH, LUCK, and ED CARNES, Circuit Judges.

LUCK, Circuit Judge:

The Federal Arbitration Act does not "apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. This "exemption," we've said, excludes from the reach of the Federal Arbitration Act employees who are in a class of workers: (1) employed in the transportation industry; and (2) that, in the main, actually engages in interstate commerce. See Hill v. Rent-A-Center, Inc., 398 F.3d 1286, 1290 (11th Cir. 2005). The issue in this case is whether (despite agreeing to arbitrate any dispute with their employer) final-mile delivery drivers—drivers who make local deliveries of goods and materials that have been shipped from out-of-state to a local warehouse—are in a "class of workers engaged in foreign and interstate commerce" and, thus, exempt under the Federal Arbitration Act from having to arbitrate their Fair Labor Standards Act claims. The district court concluded that they were exempt and refused to compel them to arbitrate their claims under the Federal Arbitration Act. But the district court misapplied Hill and wrongly

2

determined that the exemption applied.  We reverse the part of the district court's order denying the employer's motion to compel arbitration under the Federal Arbitration Act and remand for the court to determine whether the drivers are in a class of workers employed in the transportation industry and whether the class, in general, is actually engaged in foreign or interstate commerce.

The district court also denied the employer's motion to compel arbitration under state arbitration law.  The employer tries to appeal this part of the district court's order but the order is interlocutory.  There's no exception to the final order rule for orders denying motions to compel arbitration under state law.  And the district court's ruling on the state law issue is not inextricably intertwined with—or necessary to ensure meaningful review of—the applicability of the Federal Arbitration Act in order to invoke our pendent appellate jurisdiction.  Because we do not have appellate jurisdiction over this part of the order, we dismiss this part of the appeal.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

*The Parties and the Collective Action Complaint*

U.S. Pack Holdings, LLC is "a national leader in the same-day, final-mile delivery industry."[1]  It is "in the business of delivering goods"—for example, car

---

[1] There are seven defendants in this case—Partsfleet, LLC, Partsfleet II, LLC, Fleetgistics Holdings, LLC, Scriptfleet, LLC, US Pack Services LLC, Medifleet, LLC, and US Pack Holdings,

3

parts, "computers, telephones, servers, vehicles, office equipment and furniture"—"in the final phase of delivery to their final destination." The company has a warehouse network with "locations less than five miles from [forty] percent of the [United States] population." U.S. Pack "contracts directly with thousands of delivery driver[s]/couriers who utilize their own small vehicles . . . to provide the transportation and distribution services." U.S. Pack drivers "do not pick up materials from manufacturing plants and deliver them" to U.S. Pack's warehouses. Instead, the drivers deliver the goods locally from U.S. Pack's warehouses to "their final destination." As one of U.S. Pack's former operations managers explained,

> The warehouses which the drivers would go to daily contained thousands and thousands of products to be delivered. These items were delivered from 18-wheeler trucks that came from all over the country. The drivers' jobs was [sic] to then continue those products' journey to the local destinations. I have personally seen the products on the shelves and seen that they were made in Mexico, China, Malaysia, or other countries. Other products were manufactured in the United States then shipped interstate to the warehouses. The drivers' jobs would be to run their route assigned to them and deliver the parts assigned to their route which had come in on the various shipments.

Curtis Hamrick was a driver/courier for U.S. Pack. Hamrick lived in Lakeland, Florida and worked out of U.S. Pack's Lakeland and Tampa warehouses. As a U.S. Pack driver, Hamrick used his personal car to pick up car parts from U.S.

---

LLC—but U.S. Pack Holdings has integrated "Fleetgistics and its industry-focused divisions Partsfleet, Scriptfleet, and Medifleet" under the brand U.S. Pack. For ease of reference, we will do the same and call the defendants, "U.S. Pack."

Pack's Lakeland or Tampa warehouses that had been manufactured in, and shipped from, other states and countries. Hamrick would then deliver the car parts "to local Advanced Auto Parts and Auto Plus" retailers.

When Hamrick started working for U.S. Pack, he signed an independent contractor agreement. In the agreement, Hamrick said that he was "an independently established enterprise in the business of providing transportation services" and he was "solely responsible for determining how to operate [his] business and how to perform" under the agreement. The agreement, Hamrick represented, was "between two co-equal, independent business enterprises that [were] separately owned and operated." The relationship between U.S. Pack and Hamrick was "the relationship of principal and independent contractor and not that of employer and employee." They were "not employees, agents, joint venturers or partners of each other for any purpose."

Hamrick agreed, as part of his duties, to the "(1) pickup and taking of lawful custody of the cargo to be delivered; (2) safe transport of the cargo to the specified delivery location(s) in accordance with all applicable laws; (3) timely delivery and transfer of lawful possession of the product (without damage or loss) to the appropriate consignee; (4) timely submission of all information and documentation required by law and/or specified by the Customer for proof of delivery and chain of custody documentation; and (5) timely return and transfer of lawful custody of any

undeliverable cargo to the Customer."   Hamrick also agreed to use his own equipment.  U.S. Pack, for its part, agreed to pay Hamrick "service fees" for the deliveries.  But U.S. Pack had "no right to . . . control the manner or prescribe the method" of how Hamrick performed under the agreement.

"In the event of a dispute between the parties," the agreement had an arbitration provision:

> **A.  ARBITRATION OF CLAIMS:**  In the event of a dispute between the parties, the parties agree to resolve the dispute as described in this Section (hereafter "the Arbitration Provision").   This Arbitration Provision is covered by the Federal Arbitration Act, 9 U.S.C. § 1, et seq., and applies to any dispute brought by either [Hamrick] or [U.S. Pack] arising out of or related to this Agreement, [Hamrick]'s relationship with [U.S. Pack] (including termination of the relationship), or the service arrangement contemplated by this Agreement, including cargo claims and payment disputes . . . .   The terms of this Arbitration Provision shall remain in force even after the parties' contractual relationship ends.   **BY AGREEING TO ARBITRATE ALL SUCH DISPUTES, THE PARTIES TO THIS AGREEMENT AGREE THAT ALL SUCH DISPUTES WILL BE RESOLVED THROUGH BINDING ARBITRATION BEFORE AN ARBITRATOR AND NOT BY WAY OF A COURT OR JURY TRIAL.**
>
> **i.** *Claims Covered By Arbitration Provision:*  Unless carved out below, claims involving the following disputes shall be subject to arbitration under this Arbitration Provision regardless of whether brought by [Hamrick], [U.S. Pack] or any agent acting on behalf of either:  (1) disputes arising out of or related to this Agreement; (2) disputes arising out of or related to [Hamrick]'s relationship with [U.S. Pack], including termination of the relationship; and (3) disputes arising out of or relating to the interpretation or application of this Arbitration Provision, but not as to the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.  This Arbitration Provision also applies, without limitation, to disputes

regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, meal or rest periods, expense reimbursement, uniform maintenance, training, termination, discrimination or harassment and claims arising under the Uniform Trade Secrets Act, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employment Retirement Income Security Act, Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims (excluding workers' compensation, state disability insurance and unemployment insurance claims).

Hamrick, "on behalf of himself and those similarly situated," sued U.S. Pack as a collective action "for unpaid overtime compensation, liquidated damages, declaratory relief, and other relief under the Fair Labor Standards Act." (Throughout this opinion, we will call Hamrick and the other drivers in the collective action, "the drivers.") The drivers alleged that they had to sign the independent contractor agreements if they wanted to work for the company. But, the drivers alleged, U.S. Pack misclassified them as independent contractors.

The drivers were not independent contractors, they alleged, because U.S. Pack "controlled" their "job duties and pay," "instructed" them on "which customers to service," "dictated what the customer pay rates would be for" their "routes," "assigned" their "routes," required them to follow company "policies and guidelines . . . regarding their job duties," and "maintained exclusive control over" their "compensation." They were really employees of U.S. Pack under the Fair Labor Standards Act, the drivers alleged, and they were "entitled to complete overtime

7

compensation for the overtime hours worked by them." But U.S. Pack didn't pay the drivers for overtime hours. Although they "routinely worked overtime hours," the company "only paid . . . their regular pay for all hours worked." The drivers alleged that they "were entitled to be paid overtime compensation for their overtime hours worked."

U.S. Pack moved, under the Federal Arbitration Act and state arbitration laws, to compel that the drivers arbitrate their Fair Labor Standards Act claims. A few words about the Federal Arbitration Act will be helpful before we talk about what happened next.

*The Federal Arbitration Act*

"Congress enacted the [Federal Arbitration Act] in 1925" as "a response to [the] hostility of American courts to the enforcement of arbitration agreements." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 111 (2001). "To give effect to" Congress's response, "the [Act] compels judicial enforcement of a wide range of written arbitration agreements." Id.

Three sections of the Federal Arbitration Act are especially relevant to this appeal. "Generally," section two "provides for the enforceability" of any arbitration agreement in "'any maritime transaction or a contract evidencing a transaction involving commerce.'" Hill, 398 F.3d at 1288 (quoting 9 U.S.C. § 2). But section one "exempts" from the "coverage" of the Federal Arbitration Act "arbitration

agreements contained in 'contracts of employment of seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce.'" Id. at 1288–89 (quoting 9 U.S.C. § 1). The Supreme Court has "confine[d] the exemption to transportation workers," Circuit City, 532 U.S. at 109, so this part of section one is often called the "transportation worker exemption." See, e.g., Eastus v. ISS Facility Servs., Inc., 960 F.3d 207, 208 (5th Cir. 2020) ("The sole question here is whether Eastus is exempt from the Federal Arbitration Act under the Transportation Worker Exemption.").

The final relevant Federal Arbitration Act section is section four. Section four allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to "petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. U.S. Pack moved to compel arbitration under section four and its counterpart under state arbitration laws.

*U.S. Pack's Motion to Compel Arbitration*

In its motion to compel arbitration, U.S. Pack argued that the Federal Arbitration Act required that the parties arbitrate if they had "a valid, enforceable arbitration agreement and any of the [drivers'] claims [were] within its scope." U.S. Pack's independent contractor agreements with their drivers, the company said, had "valid" and "enforceable" arbitration provisions and they covered the drivers'

9

Fair Labor Standards Act claims, so the drivers should be compelled to arbitrate. U.S. Pack also argued that, even if the Federal Arbitration Act didn't apply to the drivers, the arbitration provisions in the independent contractor agreements were enforceable under state arbitration laws.

The drivers responded that they were exempt from arbitration because they were employed as transportation workers and fell within the transportation worker exemption in section one of the Federal Arbitration Act. Their employer, U.S. Pack, was a transportation company, they argued, and their job was to transport goods and materials that had moved in the flow of interstate commerce. The drivers also argued that state arbitration laws didn't apply because the arbitration provision in the independent contractor agreements "exclusively reference[d] the [Federal Arbitration Act] as the governing law which either [p]arty must submit disputes between them to arbitration." "The terms [were] clear and unambiguous and show[ed] the intent of the [p]arties was for any disputes to be arbitrated pursuant to the [Federal Arbitration Act], if at all."

The district court denied U.S. Pack's motion to compel arbitration. First, the district court concluded that the drivers were "transportation workers" under section one of the Federal Arbitration Act, and therefore the Act didn't apply to the drivers, because they transported goods that had traveled in interstate commerce and the transportation of goods in interstate commerce was not incidental to their job—it

10

was the "totality" of what they did for U.S. Pack.   Second, the district court concluded that U.S. Pack could not compel arbitration under state arbitration laws because the parties, through the arbitration provisions of the independent contractor agreements, "specifically elect[ed] to apply" the Federal Arbitration Act.  Because the arbitration provisions specified that they were "governed by the Federal Arbitration Act," the district court concluded that they "cannot be interpreted pursuant to applicable state law and must rise or fall on the application" of the Act.

U.S. Pack appealed the district court's order denying its motion to compel arbitration.

## STANDARD OF REVIEW

"We review de novo the district court's denial of a motion to compel arbitration."  Jenkins v. First Am. Cash Advance of Ga., LLC, 400 F.3d 868, 873 (11th Cir. 2005).  But we accept "the district court's findings of fact that are not clearly erroneous."  Multi-Fin. Sec. Corp. v. King, 386 F.3d 1364, 1366 (11th Cir. 2004).

## DISCUSSION

U.S. Pack argues that the district court erred twice:  first, when it concluded that the drivers were exempt from arbitration under the Federal Arbitration Act's transportation worker exemption; and second, when it concluded that it could not compel arbitration under state arbitration laws.

11

*The Transportation Worker Exemption*

The Federal Arbitration Act "exempts . . . from its coverage arbitration agreements contained in 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.'" Hill, 398 F.3d at 1288–89 (quoting 9 U.S.C. § 1).   No one argues that the drivers were "seamen" or "railroad employees."   As part of their jobs with U.S. Pack, they did not sail on ships and they did not ride the rails.   Whether the drivers are exempt from arbitration under section one, everyone agrees, turns on whether they are, or aren't, a "class of workers engaged in foreign or interstate commerce."

We've explained the meaning of the phrase "class of workers engaged in foreign or interstate commerce" in two cases, Paladino v. Avnet Computer Technologies, Inc., 134 F.3d 1054 (11th Cir. 1998) and Hill.   In Paladino, the employee's contract with her employer provided for "settlement by arbitration of any controversy or claim arising out of or relating to [her] employment or the termination of [her] employment."   134 F.3d at 1060 (opinion of Cox., J., joined by Tjoflat, J. (alterations in original)).[2]   After the employee was fired, she sued her

---

[2]  Paladino is an oddly arranged opinion.  The lead opinion was joined only by its author, then-Chief Judge Hatchett.  134 F.3d at 1055–60 (opinion by Hatchett, C.J.).  The second opinion by Judge Cox was joined by Judge Tjoflat and it is the only one to be joined by a majority of the judges on the panel.  Id. at 1060–62 (opinion by Cox, J., joined by Tjoflat, J.).  The second opinion is clear that, although it agrees with the result reached by the lead opinion, it does not agree with its reasoning.  Id. at 1060.  Thus, Judge Cox's Paladino opinion reflects the holding of the court. We have read Judge Cox's Paladino opinion as the majority opinion, for example, in Hill.  See,

12

employer "under Title VII, alleging gender discrimination." Id. The employee "refused to arbitrate," so the employer "moved for a stay and to compel arbitration pursuant to the Federal Arbitration Act [sections] 3 [and] 4." Id. (citing 9 U.S.C. §§ 3, 4). The district court denied the motion to compel. Id.

On appeal, we explained that "the appearance of the arbitration clause in an employment contract does not exempt the clause from the [Federal Arbitration Act] under that Act's first section." Id. Section one's "exemption of 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce,'" we agreed, "include[d] only employees actually engaged in transportation of goods in commerce." Id. (quoting 9 U.S.C. § 1). Because, "[a]ccording to the allegations of the complaint," the employee only "provided technical support to computer system salespeople," we concluded that her contract was not exempt under section one. Id. at 1061. There was "no evidence that" her technical support job "required her to move goods in interstate commerce," we said. Id.

In Hill, like in Paladino, the employee "signed an agreement to arbitrate any employment related claims." Hill, 398 F.3d at 1288. Sometime later, the employee

---

e.g., Hill, 398 F.3d at 1290 ("In [Paladino] we accepted the majority view among the circuits that "9 U.S.C. § 1[] includes only employees actually engaged in transportation of goods in commerce.'" (alteration in original)). Whenever we cite to Paladino throughout this opinion, we're referring to Judge Cox's opinion joined by Judge Tjoflat.

sued his employer for race discrimination.  Id.  The employer moved to compel arbitration.  Id.  The employee argued that he was exempt from arbitration because his "job duties involved making delivery of goods to customers out of state in his employer's truck" and, thus, "he was a worker in interstate commerce."  Id.  The district court stayed the case and granted the motion to compel.  Id.

On appeal, we defined the issue this way:  whether the employee, "an account manager who as part of his job duties transports merchandise across the Georgia/Alabama border, is a member of a 'class of workers engaged in . . . interstate commerce' within the meaning of the Act" and "therefore qualifies for the [section one] exemption from coverage" of the Federal Arbitration Act.  Id. at 1289 (omission in original).  We concluded that he wasn't and he didn't.  Id. at 1290.  Section one's "'engaged in commerce' exception," we explained, "should be narrowly construed to apply only to 'transportation workers' and not to employment contracts in general."  Id. at 1289 (quoting Circuit City, 532 U.S. at 119).  "[M]andatory arbitration provisions of the [Federal Arbitration Act were] applicable to all contracts of employment except those involving 'transportation workers.'"  Id. (quoting Circuit City, 532 U.S. at 119).

Thus, we said, "[t]he emphasis" in section one "was on a class of workers in the transportation industry, rather than on workers who incidentally transported goods interstate as part of their job in an industry that would otherwise be

14

unregulated." Id. "Congress was concerned only with giving the arbitration exemption to 'classes' of transportation workers within the transportation industry." Id. at 1290. To read the exemption to include "a worker employed by a company whose business dealings happen to cross state lines, would allow [section one]'s exception to swallow the general policy requiring the enforcement of arbitration agreements as pronounced" in section two of the Federal Arbitration Act. Id.

The employee argued that Paladino held section one exempted "employees actually engaged in transportation of goods in commerce." Id. (quoting Paladino, 134 F.3d at 1060–61). Because he "transport[ed] goods across state lines," the employee argued, under Paladino the section one "exemption should apply to him." Id. We rejected the employee's reading of Paladino:

> Although we applied in Paladino the requirement that the employee must "actually engage" in the transportation of goods in interstate commerce for the [section one] exemption to apply, we did not hold that the existence of that one factor alone would trigger the [section one] exemption. In other words, Paladino held that the interstate transportation factor is a necessary but not sufficient showing for the purposes of the exemption. By the same token we hold that in addition to the interstate transportation of goods requirement set forth in Paladino, the employee seeking application of [section one]'s exemption must also be employed in the transportation industry.

Id. The employee, we held, "was not within a class of workers within the transportation industry." Id. The employee's "interstate transportation activity" was "incidental" to his "employment as an account manager" for "a business that rents furniture and appliances to customers on a 'rent-to-own basis.'" Id. at 1288–89.

15

Put together, Paladino and Hill established two elements for the transportation worker exemption to apply. First, the worker "seeking application of [section one]'s exemption" must be in a class of workers "employed in the transportation industry." Id. at 1290. Second, the class of workers must, in the main, "'actually engage' in the transportation of goods in interstate commerce for the [section one] exemption to apply." Id. The class of workers' employment in the transportation industry must, in the main, have it "move goods in interstate commerce." Paladino, 134 F.3d at 1061. The "interstate transportation factor" is met where the class of workers, in its employment in the transportation industry, is engaged in "transport[ing] goods across state lines." Hill, 398 F.3d at 1290.

In this case, the drivers read the second part of the Paladino-Hill test differently. They argue that there's "binding precedent from this Circuit and the Supreme Court that drivers performing intrastate trips" meet the interstate transportation factor if "they transport items which had been previously transported interstate." In other words, the drivers contend that our court and the Supreme Court have read "class of workers engaged in foreign or interstate commerce" to mean that even if the class isn't actually engaged in foreign or interstate commercial transportation itself, it is still exempt from arbitration so long as the goods and materials it delivers traveled in foreign or interstate commerce. The drivers rely on the Supreme Court's decisions in Circuit City and Walling v. Jacksonville Paper Co.,

16

317 U.S. 564 (1943), and our decision in Walters v. American Coach Lines of Miami, Inc., 575 F.3d 1221 (11th Cir. 2009).

The issue in Circuit City was whether the section one exemption must be read "so that all contracts of employment are beyond the [Federal Arbitration Act]'s reach, whether or not the worker is engaged in transportation." 532 U.S. at 109. The Ninth Circuit held that sections one and two exempted all contracts of employment from the Act. Id. at 109–11. The other circuits that addressed the issue interpreted section one "as exempting contracts of employment of transportation workers, but not other employment contracts, from the [Federal Arbitration Act]'s coverage." Id. at 109. The Supreme Court held that "the better interpretation is to construe [section one], as most of the Courts of Appeals have done, to confine the exemption to transportation workers." Id.

The Circuit City Court did not hold, because the issue was not before it, that the transportation worker exemption applied to a class of workers that made intrastate deliveries of goods that had traveled in interstate commerce, even if the class itself did not actually engage in interstate commerce. The employee in Circuit City was a "sales counselor" at an electronics store. Id. at 110. The Circuit City Court did not discuss whether this employee ever traveled. As we said in Hill, "Circuit City involved a challenge to the application of the [Federal Arbitration Act] to employment contracts in general in which the Ninth Circuit had held that the

17

[section one] exception for the 'other class of workers engaged in foreign or interstate commerce' exempted all employment contracts from [the Act]." Hill, 398 F.3d at 1289 (quoting Circuit City, 532 U.S. at 112). No more and no less.

Even if Circuit City could be read as binding precedent defining the scope of the transportation worker exemption, we put our definitive gloss on what that precedent meant in Hill. "The principle Supreme Court case addressing the [section one] exception," we said in Hill, "is Circuit City." Id. The Supreme Court "concluded," we explained, "that the [Federal Arbitration Act]'s 'engaged in commerce' exception should be narrowly construed to apply only to 'transportation workers' and not to employment contracts in general." Id. (quoting Circuit City, 532 U.S. at 119). The Supreme Court's "emphasis," we said, "was on a class of workers in the transportation industry, rather than on workers who incidentally transported goods interstate as part of their job in an industry that would otherwise be unregulated." Id. Having analyzed Circuit City and Paladino, we then set out the test for determining which workers are "transportation workers" within the narrow exemption in section one: "we hold that in addition to the interstate transportation of goods requirement set forth in Paladino, the employee seeking application of [section one]'s exemption must also be employed in the transportation industry." Id. at 1290. This two-part framework is our last word on how we apply the transportation worker exemption.

18

The drivers also argue that we are bound by <u>Walling</u> and <u>Walters</u> to conclude "that drivers performing intrastate trips" fall within the transportation worker exemption where "they transport items which had been previously transported interstate." We are not.

<u>Walling</u> and <u>Walters</u> have nothing to do with the transportation worker exemption or even the Federal Arbitration Act. <u>Walling</u> interpreted the phrase "engaged in commerce" in the Fair Labor Standards Act, 317 U.S. at 566–67, and <u>Walters</u> interpreted a regulation explaining the jurisdiction of the Motor Carrier Act that included the phrase "in interstate or foreign commerce," 575 F.3d at 1228–29. The drivers' thinking appears to be that if we and the Supreme Court have interpreted a phrase in one statute, the same phrase in another statute must mean the same thing. But reading statutes is not like playing with Lincoln Logs. Absent textual evidence that Congress borrowed language from one statute to graft onto a second statute, <u>United States v. Martinez</u>, 964 F.3d 1329, 1337–38 (11th Cir. 2020) ("The sentencing commission borrowed 'facilitate, or have the potential of facilitating' from <u>Smith</u> to define section 2K2.1(b)(6)(B)'s 'in connection with' element. The borrowing matters because [w]hen a statutory term is obviously transplanted from another legal source, it brings the old soil with it." (quotation omitted)), you can't take a piece from one structure and put it on top of another and automatically expect it to fit.

19

Take, for example, a city's ordinance that says, "all nails shall be painted blue." E.g., Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 20 (Thomas/West 2012). If we were to interpret this phrase, and learn that it was part of the city's building code and followed in the same sentence, "When building a new structure . . . ," we would reasonably construe it to mean that all "slender and usually pointed and headed fastener[s] designed for impact insertion" must be painted blue when used to build a new structure. See Nail, Webster's Third New Int'l Dictionary 1500 (3d ed. 1986). But if we saw that the phrase was part of the city's code regulating salons and followed in the same sentence, "When using polish . . . ," we would reasonably view the phrase to mean that "the horny plate of thickened and condensed epithelial stratum lucidum that grows out from a vascular matrix of cutis and sheaths the upper surface of the end of each finger and toe of man" must be painted blue. Id. The context and content of the surrounding words matter in how we understand words and phrases. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 466 (2001) ("Words that can have more than one meaning are given content, however, by their surroundings . . . .").

The Supreme Court has warned us that "[t]he phrase 'in commerce' does not, of course, necessarily have a uniform meaning whenever used by Congress." United States v. Am. Bldg. Maint. Indus., 422 U.S. 271, 277 (1975). We don't give "in commerce" or "engaged in commerce" the same meaning it has in the other statutes

20

just because Congress used the same terms in the Federal Arbitration Act. Specifically, in Circuit City, the Supreme Court rejected the employee's argument that "engaged in commerce" should be interpreted the same way as other federal statutes that used the same phrase. See 523 U.S. at 116–18 (rejecting the argument that "statutory jurisdictional formulations necessarily have a uniform meaning whenever used by Congress" (quotation omitted)). Instead, the Court said, "[w]e must . . . construe the 'engaged in commerce' language in the [Federal Arbitration Act] with reference to the statutory context in which it is found and in a manner consistent with the [Act]'s purpose." Circuit City, 532 U.S. at 118.

The statutory context is particularly significant in the Federal Arbitration Act. Two sections in the Act reference "commerce." Section two directs that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract" generally will be "valid, irrevocable, and enforceable." 9 U.S.C. § 2 (emphasis added). By using the phrase "involving commerce" in section two, Congress, the Supreme Court explained, "exercise[d] [its] commerce power to the full." Circuit City, 532 U.S. at 112 (quoting Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277 (1995)). In Circuit City, the employee argued that the phrase "engaged in . . . commerce" in section one should be given the same "reach" as "involving commerce" in section two because the two provisions "are coterminous." Id. at 114. The Supreme Court

21

rejected the employee's argument because, unlike "involving commerce," "the general words 'in commerce' and the specific phrase 'engaged in commerce' are understood to have a more limited reach." Id. at 116. "The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'" Id. at 118. Because of the difference, the Supreme Court explained, the transportation worker exemption must be given "a narrow construction" and a "precise reading." Id. at 118–19.

Also, the statutes in Walling and Walters have a very different purpose than the Federal Arbitration Act. The Fair Labor Standards Act has a "remedial purpose," and the Supreme Court has told us that we do not give its exemptions a narrow construction. See Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018) ("We thus have no license to give the exemption anything but a fair reading."). The Motor Carrier Act is likewise "a remedial statute intended to promote public safety." Schilling v. Schmidt Baking Co., 876 F.3d 596, 602 n.4 (4th Cir. 2017). The Federal Arbitration Act, on the other hand, has a "pro-arbitration" purpose, requiring us to give the section one transportation worker exemption "a narrow construction." Circuit City, 532 U.S. at 115, 118.

On top of the purpose of the Federal Arbitration Act being completely different from the Fair Labor Standards Act and the Motor Carrier Act, the drivers' reliance on Walling and Walters has another problem—these statutes use different

22

words.  While Walling interpreted the phrase "engaged in commerce" in the Fair Labor Standards Act, the transportation worker exemption in the Federal Arbitration Act applies to a "class of workers," similar in kind to seamen and railroad employees, "engaged in foreign or interstate commerce."  9 U.S.C. § 1 (emphasis added).   Unlike the Fair Labor Standards Act, for the transportation worker exemption to apply the "commerce" has to be "in" a specific place—"foreign or interstate."  These extra words matter (as all words matter) and they especially matter here where the issue is whether the class of transportation workers has to actually engage in interstate commerce.

Walters is even further off the mark.  It construed a regulation interpreting the jurisdiction of the Secretary of Transportation over motor carriers "engag[ing] in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce."  Walters, 575 F.3d at 1228.  But unlike the transportation worker exemption, the phrase in Walters does not modify "engaged" and does not refer to the type of workers to describe who must do the transporting or what must be transported.

There being no other binding precedent from the Supreme Court and this court defining the scope of the transportation worker exemption, Paladino and Hill control. The transportation worker exemption applies if the employee is part of a class of

23

workers:  (1) employed in the transportation industry; and (2) that, in the main, actually engages in foreign or interstate commerce.  Hill, 398 F.3d at 1290; Paladino, 134 F.3d at 1060–61.

But even if we were not bound by Paladino and Hill, we would reject the drivers' view that the transportation worker exemption is met by "performing intrastate trips . . . transport[ing] items which had been previously transported interstate."  The Paladino-Hill test, requiring that a class of workers actually engage in foreign or interstate commerce, is more faithful to the text of section one that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.

Paladino and Hill are more faithful to the text because, like section one, they focus on what a class of worker must be engaged in doing and not the goods. Paladino and Hill require that the class "actually engages" in the transport of goods interstate.  This is consistent with the text of the transportation worker exemption, which applies to "workers engaged in foreign or interstate commerce."  9. U.S.C. § 1.  The drivers instead focus on the goods.  They say, even if the worker does not actually engage in transporting goods in interstate commerce, it's enough that the goods that are being transported have crossed state lines.  But in the text of the exemption, "engaged in foreign or interstate commerce" modifies "workers" and not

24

"goods." (The word "goods" isn't even in section one and the exemption never mentions what has to be transported.) The workers must be engaged—or "[o]ccupied" or "employed," Engaged, Webster's New Int'l Dictionary 725 (1st ed. 1909); Engaged, Webster's Collegiate Dictionary 333 (3d ed. 1919) (same)—in interstate commerce. Section one is directed at what the class of workers is engaged in, and not what it is carrying. Paladino and Hill capture that direction by requiring that the class of workers actually engages in the transportation of persons or property between points in one state (or country) and points in another state (or country). See Rittmann v. Amazon.com, Inc., 971 F.3d 904, 926 (9th Cir. 2020) (Bress, J., dissenting) ("[D]ictionaries from the period when Congress enacted the [Act] defined . . . '[i]nterstate commerce' . . . as [t]raffic, intercourse, commercial trading, or the transportation of persons or property between or among the several states of the Union, or from or between points in one state and points in another state.'" (quoting Interstate Commerce, Black's Law Dictionary (2d ed. 1910) (third alteration in original))).

So does Wallace v. Grubhub Holding, Inc., 970 F.3d 798 (7th Cir. 2020). There, food delivery drivers made the same argument that the drivers in this case make: the drivers were transportation workers exempt from the Federal Arbitration Act because "they carr[ied] goods that ha[d] moved across state and even national lines." Id. at 799, 802. The potato chips they delivered in Chicago, the drivers

25

contended, came from Idaho and the chocolate they delivered came from Switzerland. Id. at 802. The Seventh Circuit rejected the drivers' argument that the exemption is "not so much about what the worker does as about where the goods have been." Id.

Rather, to qualify for the exemption, the Seventh Circuit said, "a class of workers must themselves be engaged in the channels of foreign or interstate commerce" like seamen and railroaders. Id. (quotation and emphasis omitted). The drivers in Wallace—who drove from local businesses to nearby residences and back to the local businesses—were not. As then-Judge Barrett explained, if all a plaintiff has to show for the exemption to apply is that she's in a class of workers that did no more than deliver goods that had traveled in interstate commerce, then it would

> sweep in numerous categories of workers whose occupations have nothing to do with interstate transport—for example, dry cleaners who deliver pressed shirts manufactured in Taiwan and ice cream truck drivers selling treats made with milk from an out-of-state dairy. That result would run afoul of the [Supreme] Court's instruction that the scope of [section one] "be controlled and defined" by the work done by seamen and railroad workers, Circuit City, 532 U.S. at 106, not to mention its admonition that [section one] as a whole must be "afforded a narrow construction." Id. at 118.

Id. For that reason, the Seventh Circuit rejected the local delivery drivers' argument that they were exempt under section one because the goods they delivered—chips and chocolate—had come from out of state.

26

Paladino and Hill are also more faithful to the text because they define the residual phrase "class of workers engaged in foreign or interstate commerce" consistently with the other transportation workers mentioned in the exemption, "seamen" and "railroad employees."  As the Supreme Court instructed in Circuit City,

> The wording of [section one] calls for the application of the maxim ejusdem generis, the statutory canon that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  Under this rule of construction the residual clause should be read to give effect to the terms "seamen" and "railroad employees," and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it; the interpretation of the clause pressed by respondent fails to produce these results.

532 U.S. at 114–15 (citations omitted).

"[S]eamen" and "railroad employees" work on ships and railroad cars that commonly move in foreign and interstate commerce.  Generally, they travel from state-to-state, or country-to-country, going from one place to the other.  The drivers' view of the residual clause—that it applies to a class of workers that only makes "intrastate trips" transporting goods that have moved in interstate commerce—is inconsistent with the general interstate and international work of "seamen" and

27

"railroad employees," and erroneously focuses on the goods.[3] Paladino, on the other hand, defines "class of workers engaged in foreign and interstate commerce" in a way that gives effect to what typical "seamen" and "railroad employees" do—actually engage in interstate or international commercial transportation.

\* \* \* \*

In sum, we agree with U.S. Pack that the district court erred in applying the Paladino-Hill test. The district court concluded that the drivers fell within the transportation worker exemption because "the goods at issue in this case originate[d] in interstate commerce and [were] delivered, untransformed, to their destination." The "deliveries," the district court explained, were "from out of state merchants delivering to customers in the local area" that the drivers "service[d]." Like the drivers, the district court focused on the movement of the goods and not the class of workers. This was error. The transportation worker exemption applies only if the worker belongs to a class of workers in the transportation industry and the class of workers actually engages in foreign or interstate commerce. Hill, 398 F.3d at 1290; Paladino, 134 F.3d at 1060–61.

---

[3] We say "generally" and "commonly" and "in the main" because the focus of the transportation worker exemption is on the class of workers and not on the individual plaintiff. Just as not every seaman or railroad employee actually travels in foreign or interstate commerce, section one does not require that every member of the class of workers has to actually engage in interstate commerce. The exemption applies if the class of workers actually engages in foreign or interstate commerce in the way seamen and railroaders ordinarily do, even if some plaintiffs in the class do not.

Because the district court erred in applying the Paladino-Hill test, we reverse the order denying U.S. Pack's motion to compel and remand for the district court to apply the proper test. At this stage of the litigation, determining whether the drivers are in a class of workers employed in the transportation industry that actually engages in foreign or interstate commerce involves factfinding and the weighing of conflicting evidence that is properly the role of the district court. See, e.g., Norelus v. Denny's, Inc., 628 F.3d 1270, 1293 (11th Cir. 2010) ("[A]s everyone knows, appellate courts may not make fact findings."). We leave for the district court to determine whether the drivers are in a class of workers employed in the transportation industry and whether, in the main, the class actually engages in interstate commerce (even if some individual plaintiffs do not).

*State Arbitration Laws*

U.S. Pack argues that, even if the Federal Arbitration Act does not apply to compel the drivers to arbitrate because of the transportation worker exemption, state arbitration laws applied to the independent contractor agreements and the district court should have looked to those laws to compel arbitration. The district court erred, U.S. Pack contends, by refusing to compel arbitration under the state arbitration laws applicable to the agreements. We agree with the drivers that we don't have appellate jurisdiction to review this part of the district court's order.

29

The order denying U.S. Pack's motion to compel arbitration is an interlocutory order—the case is still pending in the district court—and we're "generally precluded from hearing interlocutory appeals under the final judgment rule." Wajnstat v. Oceania Cruises, Inc., 684 F.3d 1153, 1155 (11th Cir. 2012); see also Birmingham Fire Fighters Ass'n 117 v. City of Birmingham, 603 F.3d 1248, 1254 (11th Cir. 2010) ("[F]inal judgments of a district court are appealable to the United States Courts of Appeals, whereas interlocutory orders are not."). But the Federal Arbitration Act carves out exceptions to the general rule allowing review of some interlocutory orders, including orders "denying a petition under section [four] of [the Act] to order arbitration to proceed." 9 U.S.C. § 16(a)(1)(B). Recall that section four is the one that allowed U.S. Pack to move to compel arbitration under the Federal Arbitration Act. So, to the extent the district court denied U.S. Pack's motion to compel arbitration under section four, that order was appealable and we have reviewed it.

But the interlocutory appeal section of the Federal Arbitration Act doesn't carve out an exception to the general rule for interlocutory orders denying motions to compel arbitration based on state law. U.S. Pack concedes as much but argues that we have "pendent appellate jurisdiction" over the part of the district court's order denying the motion to compel based on state arbitration law.

"Pendent appellate jurisdiction is present when a nonappealable decision is 'inextricably intertwined' with the appealable decision or when 'review of the former decision [is] necessary to ensure meaningful review of the latter.'" King v. Cessna Aircraft Co., 562 F.3d 1374, 1379 (11th Cir. 2009) (alteration in original) (quoting Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 51 (1995)). "[P]endent appellate jurisdiction should be present only under rare circumstances," and does not exist where "resolution of the nonappealable issue [is] not necessary to resolve the appealable one." Id. at 1379–80. "Issues are not 'inextricably intertwined' with the question on appeal when 'the appealable issue can be resolved without reaching the merits of the nonappealable issues.'" Paez v. Mulvey, 915 F.3d 1276, 1291 (11th Cir. 2019) (quoting In re MDL-1824 Tri-State Water Rts. Litig., 644 F.3d 1160, 1179 (11th Cir. 2011)).

This case is not a rare circumstance. The interpretation and applicability of the transportation worker exemption under the Federal Arbitration Act is an issue of federal law. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) ("The effect of . . . section [two] is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."). We can (and do) resolve this issue without deciding, or referencing, state arbitration law and whether state arbitration law is applicable in this case. We would only look to state arbitration law after we decided the federal issue of whether the

31

transportation worker exemption applied to the drivers. There was no overlap between the state arbitration law and Federal Arbitration Act issues; they were separate and not intertwined, and definitely not inextricably so.

U.S. Pack asks us to follow the Third Circuit's decision in Palcko v. Airborne Express, Inc., 372 F.3d 588 (3d Cir. 2004). There, the Third Circuit used its pendent appellate jurisdiction to review the part of a district court's order concluding that an arbitration agreement was enforceable under Washington state law "even if [the employer's] arbitration agreement with [the employee was] exempt from the [Federal Arbitration Act]'s coverage" because the employee was a transportation worker under section one. Id. at 593–95. Relying on its precedent, the Third Circuit explained its test for pendent appellate jurisdiction: "the use of pendent appellate jurisdiction . . . should be used sparingly, and only where there is sufficient overlap in the facts relevant to both the appealable and nonappealable issues to warrant plenary review." Id. at 594 (citation and quotation marks omitted). Reviewing the facts in that case, the Third Circuit found that there was "sufficient overlap . . . to warrant plenary review." Id.

We are unpersuaded. First, our court applies a different, and (apparently) narrower, test for pendent appellate jurisdiction. Our pendent appellate jurisdiction extends over nonappealable issues only "that are inextricably intertwined or inextricably interwoven with the issue on appeal." Paez, 915 F.3d at 1291 (citation

32

and quotation marks omitted). The Third Circuit, according to <u>Palcko</u>, extends its pendant appellate jurisdiction "where there is sufficient overlap in the facts relevant to both the appealable and nonappealable issues to warrant <u>plenary</u> review." 372 F.3d at 594 (citation and quotation marks omitted). To the extent there's a difference, we are bound to apply our pendent appellate jurisdiction test. And as we have explained, under our test the nonappealable issue of whether state arbitration laws applied to the drivers' independent contractor agreements was not necessary to resolve the appealable issue of whether the federal transportation worker exemption applied to the drivers.

Second, even if we used the Third Circuit's "sufficient overlap" test, the facts relevant to the appealable and nonappealable issues in this case did not overlap. The relevant facts of the appealable issue—whether the transportation worker exemption applied to the drivers—were about whether, as part of the drivers' jobs, they were employed in the transportation industry and actually engaged in the transportation of goods in foreign or interstate commerce. The relevant facts of the nonappealable issue—whether state arbitration law compels the parties to arbitrate—were about whether the independent contractor agreements incorporated state law and whether the parties intended to arbitrate under state law even if the Federal Arbitration Act was inapplicable. There was no factual overlap between the two issues.

Under any formulation of the pendent appellate jurisdiction test—ours or the Third Circuit's—we do not have jurisdiction to review the part of the district court's order denying the motion to compel arbitration under state law. Because we don't have jurisdiction to review this part of the order, we express no opinion on whether the district court got the state law arbitration issue right. Any appellate review of that issue will have to wait for another day.

## CONCLUSION

In sum, we reverse the part of the district court's order denying U.S. Pack's motion to compel arbitration under the Federal Arbitration Act and remand for the district court to determine whether the drivers are in a class of workers employed in the transportation industry and whether, in the main, the class actually engages in interstate commerce. We dismiss for lack of appellate jurisdiction U.S. Pack's appeal of the part of the district court's order denying the motion to compel arbitration under state arbitration law.

**REVERSED AND REMANDED IN PART WITH INSTRUCTIONS and DISMISSED IN PART.**